ALLEN, Chief Judge.
The appellants, owners of certain property, filed their bill of complaint against the appellees in which they sought a decree cancelling an option, two assignments of the option, and an agreement which ap-pellees described as a renewal of the option. The appellees answered and, by counterclaim, sought to force the appellants to carry out the agreement to sell to them.
The lower court then entered a final decree cancelling all the instruments. The purchasers appealed to the Supreme Court.
The facts as set forth in the Supreme Court opinion and supplemented by the record as of that point in the history of this case are as follows:
Bellamy agreed to sell certain lands to W. T. Cox, trustee for a corporation later to be formed, and an option for the purchase was executed on September IS, 1953, and recorded on October 15, 1953, and exchanged for a payment of $1,000 in cash. In the instrument it was provided that if title to more than 15% of the lands was not insurable, the sellers were to bring suit to *216 quiet the title within a reasonable length of time, not to exceed one year. The trustee was to bear the expense of the suit but he was granted the privilege of accepting the title in its then condition, by warranty deed, if it developed that the title could not be cleared within the prescribed period.
It was agreed that the option should be effective for a period of six months unless it should be necessary to quiet title in which event the life of the option would be extended for that purpose for a reasonable time but not to exceed one year from its date.
Bellamy was advised about March 19, 1954, that an examination had disclosed that suit to quiet title was necessary and he replied in April, 1954, that he expected to close the deal and receive the funds within one year of the date of the original option thereby indicating that he took no exception to the tardiness of the notice to him. The option was dated September 15, 1953.
Thus the option was to expire March 15, 1954, unless the suit was necessary, a question obviously to be decided by the vendee and if the suit was found by him to be necessary, the sellers, in effect, granted themselves an enlargement of the time so they could institute and conclude the suit, but restricted themselves to the period that would expire September 15, 1954.
On August 9, 1954, only 37 days before the expiration of one year computed from the date of the option, the optionee, W. T. Cox, trustee, assigned the instrument to Joe Priest, Inc., and on November 6, 1954, the sellers entered into an agreement with that corporation and with Joe Priest and his wife, Maxine Priest. Apparently the sellers did not have the title quieted and as of this time was still uninsurable thus the sum of $1,000 was still in their possession.
The agreement between Bellamy and Priest provided that title to the tracts in Townships 18 and 19 of Range 16 was of such condition that a proceeding to' quiet title was imperative and that the suit would require considerable time. Under this contract title was to be quieted by the buyers and a “reasonable” time was stipulated for that purpose. There were numerous provisions concerning sales and distribution of proceeds. The contract stated that the consideration was $10, “to each in hand paid by the other.” The agreement stipulated that the tracts in Range 17 could be quickly sold, and the price per acre, manner of distributing the proceeds and terms of payment were specified. However, title to lands in Townships 18 and 19 of Range 16 apparently would take a great deal of time to clear.
On December 15, 1954, Joe Priest, Maxine Priest and Joe Priest, Inc., assigned both the option and the Bellamy-Priest contract to Joe Priest, C. M. Dunham, M. D. Andrews, P. C. Crapps, Jr., L. M. White and Harlow Land. There was also an agreement with these assignees which transferred the obligation to bring the suit from the sellers to the buyers.
It appears that in April, 1955, Bellamy listed the property for sale with a broker after having been unsuccessful in selling the land through the complicated dealings thus far. An attorney wrote to Bellamy stating that Andrews (holder of one-eighth of the option to buy) wished to purchase the land regardless of Joe Priest (the original holder of the second option and still the holder of the largest interest).
Thus, on November 17, 1955, Bellamy brought suit to declare the option abandoned and thereby commenced this litigation. Andrews filed an answer and counterclaimed seeking specific performance of the contracts. The chancellor (not the judge from whom the present appeal is taken) then decreed that all of these instruments were unenforceable.
Justice Thomas, speaking for the Court in Cox v. Bellamy, Fla.1957, 93 So.2d 64, 67, held that the vendors were not in a position to bring the suit and that the case must be reversed. The Court reviewed *217 its reasons for its holding which are summed up in the following language:
“Inartificially as the contract appears to have been drawn, we do not find support in the record for the charge that the apparent inexpertness of the author [buyer’s counsel] was studied, or purposeful. Nor do the actions of the parties afterward convince us that any advantage was taken of the sellers by the buyers. It seems to us that the indifference of the latter was matched by the lethargy of the former * * *
“ * * * They [the vendors] possibly once possessed the right to bring the matter to an end because of the lapse of a 'reasonable time’ but to do so they should have first given the appellants [buyers] notice of such intention. [Citations omitted].
“We must disagree with the chancellor and reverse his decree with directions to proceed in accordance with the views we have expressed. Reversed.”
During the time that this option was open to Cox, prior to and during this aforementioned appeal, certain transactions involving parcels of this realty apparently were made by Bellamy. After this cause was remanded to the circuit court, the purchasers or optionees, filed an amended counterclaim seeking specific performance of the option and articles of agreement. The defendants to this amended counterclaim were Bellamy, the optionor vendor, the grantees to whom Bellamy had sold some of the realty, and Mitchell who had acquired contracts to purchase some of the realty.
The grantees, hereafter referred to as the Bellamy to Baker grantees, filed an answer alleging several defenses to the counterclaim. These defenses, stated briefly, are as follows:
1.No notice of the prior option extended to Cox or of the counterclaim that was originally filed.
2. That the cenveyances to Baker grantees by Bellamy were authorized and contemplated by the original articles of agreement.
3. That the option and articles of agreement were so ambiguous that specific enforcement would be inequitable and unjust.
After this answer was filed, and before testimony was taken, the option-holders, Cox et al., moved for summary judgment on their counterclaim. The lower court held the defenses insufficient and entered a summary decree cancelling the deeds that Bellamy executed to Baker, and requiring Bellamy to specifically perform the agreement to sell to Cox, et al.
No notice of lis pendens was ever filed in this suit by Bellamy. No notice of lis pendens was filed by Andrews until he filed his amended counterclaim on October 24, 1957, bringing the Baker grantees and the other contract purchasers from Bellamy into the suit for the first time.
The first final decree was entered on March 10, 1956. The notice of appeal is shown by the Register of Instruments in Citrus County to have been registered May 31, 1956. The Chancery Docket shows the notice of appeal to have been recorded on May 7, 1956. The notice of appeal itself bears two filing dates: May 7, 1956, and May 31, 1956. The Baker grantees thus having recorded their deeds, under which they claim title, prior to May 31, 1956, claim that they were not charged with notice of the Andrews’ suit at the trial level or on the first appeal.
During the second path of trial and appeal W. A. Bellamy died and his wife has been substituted as executrix. M. D. Andrews died and his executor has been substituted as a party. Clem J. Hohmer died and his unknown heirs have been made parties to the cause.
The following quotations from the lucid summary decree entered herein by the *218 trial judge will clarify the questions involved in this appeal:
“On final hearing the prayer of W. A. Bellamy and wife for cancellation of these instruments was granted, and the counter-claim filed by the counter-claimants was dismissed. This decision was appealed to and reversed by the Supreme Court, and its mandate ordered the complaint dismissed and that the cause proceed to final hearing on the counter-claim of the counter-claimants.
“The final decree in the original suit was entered on March 8, 1956, and from March 7, 1956, to November 8, 1956, numerous contracts of sale and deeds of conveyance were made by the Bellamys to different parties who are named as defendants in the suit now pending on the counter-claim.
<( ‡ * * ‡ * *
“The motion for summary decree is based on the pleadings, the evidence taken at the trial of the original suit, the Supreme Court opinion, the answers to interrogatories, and the affidavit of one Harlow Land. One affidavit, that of Russell G. Smiley, has been filed on behalf of all the defendants.
“ * * * * * *
“There does not appear to be any genuine issue or dispute of material fact by the Bellamys in the affidavit which they have filed. The questions presented by the Bellamys in their defenses appear to be entirely questions of law. One such contention of the Bellamys, and also of the remaining defendants, is that under the terms of the articles of agreement itself, it is the desire of all parties that a quick sale of certain of said lands be made, and that they be immediately offered for sale at a price that will net the Bellamys a stated sum of money per acre for such land, and that under and in accordance with the terms of the articles of agreement, the Bellamys sold said lands to the defendants at not less than the price designated, and are willing to account to the counter-claimants and to pay to them their part of the proceeds of such sales.
“Counter-claimants contend, that under the terms of paragraph 2 of the option, they have the privilege of accepting title as is by warranty deed and closing the matter out, and, as set out in paragraph F of their counterclaim they notified the Bellamys by letter on October 19, 1955, that they were ready, willing and able to purchase under the terms of the option and articles of agreement, but the Bellamys failed and refused to sell and convey, and that it was subsequent to this date, to-wit, on March 7, 1956, before any contract or deed was executed and delivered by the Bellamys to any of these lands.
"* * * * * *
“Therefore, even though the letter of October 15, 1955, might be subject to' the defects therein as claimed by the counter-defendants, this offer was-again made in the counter-claim by all of the owners, in which they agreed to accept such title as the Bellamys then had.
“It will be noted that no sale under contract or deed to any of the defendants was placed of record until approximately three months thereafter, on March 7, 1956.
“It Is Therefore the Opinion of the Court that the Bellamys had no authority after December 8,1955, to make any contracts of sale or deeds of conveyance of said lands.”
The effect of the last paragraph above quoted is that the counterclaim filed on December 8, 1955, was a demand on behalf of all of the Cox-Priest purchasers demanding specific performance of their contracts with Bellamy which also had the effect of *219 -terminating any authority which Bellamy had to make any contract of sale or deeds of conveyance to the property covered by the said suit. This date, December 8, 1955, is important as holding invalid the sales made by Bellamy after December 8, 1955.
The appellants, Kenneth A. Baker and others, contend in their brief that contracts to sell between 4,000 and 7,000 acres, out of a total of approximately 12,000 acres covered by the articles of agreement, were executed by Bellamy, and he had purchasers ready to sign contracts to buy the balance of the land before Andrews ever requested performance of the contract by Bellamy.
Many questions are raised in the briefs of the parties. As pointed out by the Supreme Court in a prior appeal of this case, the instruments upon which this controversy arose were inaptly drawn, leading to much confusion in the applications. The court observes there are several mistakes in the briefs of the parties, particularly as to dates, which have not clarified this litigation.
We shall affirm the lower court except as to that part of the summary decree which determines as a matter of law that there was no genuine issue as to any sales made by Bellamy prior to December 8,1955. We are of the opinion that the pleadings, including testimony at the former trial, affidavits, and responses to questionnaires, fail to show that there was not a genuine issue as to the rights of the Baker grantees in any sales that may have been made prior to December 8, 1955.
The appellees, in their brief, argue that the effect of the proofs filed on behalf of the appellees in support of the summary decree is that there were no subsequent purchasers who acquired their interest in the lands prior to October 19, 1955, thus no genuine issue of material fact exists and the summary decree should stand. The determination of the trial judge in the summary decree was that the Bellamys had no authority after December 8, 1955, as this was the cut-off period as determined by the counterclaim.
It is important that an examination be made of the pleadings, affidavits, and responses to questionnaires to determine if there was any issue before the trial judge which would preclude a summary judgment, in effect holding that the Bellamy grantees had not purchased any of the property from the Bellamys prior to December 8, 1955.
The second amended counterclaim, in effect, alleged that the counter-plaintiffs, Joe Priest et ah, had performed - all the deeds and obligations incumbent upon them under the provisions of the option and the articles of agreement, and that the counter-defendant, W. A. Bellamy, was. notified by letter dated October 19, 1955, that they were willing, ready and able to purchase under the terms of the option and -agreement.
The answers to the second amended counterclaim denied that the counter-claimants ever notified the counter-defendants that they are ready, willing and able to purchase the lands as in and by the letter they expressly excluded from the terms thereof the counter-claimant Joe Priest, who was then the owner of one-half interest in said contract and furthermore the counter-claimants well knew at that time that the counter-defendants had already entered into numerous contracts of sale for portions of said land, and, therefore, could not cancel those contracts and convey the property to the counter-claimants, and well knew that after November 6, 1954 and prior to October 19, 1955, when said letter was written, the counter-claimants had done nothing to comply with their contract and had forced the counter-defendants to take such action as they deemed advisable to accomplish the purpose of said contract, which was to expedite and see to the prompt sale of said property.
Again the answer the counter-defendants state:
“That in accordance therewith, the ■ plaintiffs and counter defendants have *220 sold certain of the lands involved in this suit, as shown in the Answer to Interrogatories filed with the Answer to cross complaint. That a certain part of the moneys received is to be retained by the counter defendants and credited upon the full purchase price as is shown by said Agreement.”
Motion for summary decree was filed by counter-plaintiffs, W. T. Cox and others, on August 11, 1958, and alleged that in support of their motion that they would show that it appeared from the pleadings and the evidence taken at the trial, the opinion of the Supreme Court of Florida, the answers filed by the counter-defendants Bellamy to counter-plaintiffs’ interrogatories and counter-plaintiffs’ affidavit attached to motion for summary decree, that the only question remaining for the court’s determination is whether or not as a matter of law the grantees of counter-defendants Bellamy, joined as counter-defendants herein, were, at the time said counter-defendants took title to portions of said lands under their respective deeds, on notice of and took title to said lands subject to counter-plaintiffs’ right to purchase the said lands under the terms of their option and agreement with counter-defendants Bellamy.
The affidavit of Harlow Land, which was one of the counter-plaintiffs, alleged certain facts that appeared from the records of Citrus County, among which were that from 15 October 1953, to present date, the counter-plaintiffs’ interest in and right to purchase said lands had been a matter of public record by duly recorded instruments, and although the trial court decreed on 8 March 1956 that said contract to sell was cancelled, counter-plaintiffs, within the time for taking appeals, duly perfected their appeal to the Supreme Court of Florida from said final decree, resulting in reversal thereof and reinstatement of said contract under which counter-plaintiffs have claimed and now claim the right to purchase said lands.
The affidavit of Harlow Land further states:
“Prior to 19 October 1955 no sale of any part of said lands had been agreed to by Counter-Plaintiffs or their assignors, nor had any action been taken by Counter-Defendants Bellamy to correct the title to said lands; since 19 October 1955 Counter-Plaintiffs and their assignors have neither authorized nor agreed for Counter-Defendants Bellamy, or anyone else to sell any part of said lands to persons other than Counter-Plaintiffs herein, nor to take any action with respect to clearing the title to said lands.
“Notwithstanding said notice of 19 October 1955 to Counter-Defendants Bellamy of election to purchase, and notwithstanding that since 19 October 1955 Counter-Plaintiffs have never authorized the sale of any part of said lands, during the period from 7 March 1956 to 19 September 1956, Counter-Defendants Bellamy have executed and delivered certain contracts and deeds, and have received back certain mortgages (as will more fully appear from Counter-Defendants Bellamy’s answer filed to Counter-Plaintiffs’ interrogatories herein), by which Counter-Defendants Bellamy purported to sell to-the other Counter-Defendants herein substantially all of said lands which Counter-Defendants Bellamy were then obligated to sell and convey to Counter-Plaintiffs under the terms of said contract and said notice.”
The brief for appellants Kenneth A. Baker et al. delineates some of the testimony of J. H. Rogers, a real estate broker with whom Bellamy had listed the lands involved herein. This testimony, which we have verified from the record, is as follows :
“Q. In 1955 did you try to sell some land for him there? A. Yes.
“Q. When did you start on that? A. My salesman, Mr. Shoaf started— *221 I suppose it must have been April or May when he first began listing the land and we sold the first off of those in October.
“Q. Did you have actual sales of any large portion of that land or lands so far as finding purchasers who were willing to buy? A. Yes I had actual sales and money up on deposits for some — I’ll say 4,000 acres, something like that, at that time.”
Jay Shoaf, a real estate salesman associated with J. H. Rogers, testified:
“Q. Mr. Shoaf, have you and your office been trying to sell certain lands belonging to Mr. Bellamy in Inverness, Florida? A. Yes sir.
“Q. Are those the lands that were under option to a Mr. Cox, or do you know ? A. I understand there was an option on it at one time. I don’t know who had the option.
“Q. How many acres of land was in the tract? Approximately. A. I would say somewhere between 9 and 12 thousand.
"Q. Did you at any time go to the office of Mr. Wilson in Bronson with Mr. Bellamy? A. Yes sir.
“Q. When was that? A. I can’t give the exact day but I think it was during month of September, ’55.
“Q. Had you, prior to that time, been trying to sell any of Mr. Bellamy’s land? A. Yes.
“Q. Had you negotiated any sales or contracts? A. Yes.
“Q. How many contracts or how many acres had you had executed, if you did have? A. I can’t recall the exact amount, something around — well somewhere between 5 and 7 thousand acres.
“Q. When you went to Mr. Wilson’s office, had those contracts already been signed by Mr. Bellamy and the buyer? A. Yes.
“Q. Had you ¡received down payments on it? A. Yes.”
Interrogatories were submitted to the counter-defendants in which they were required to answer the following question:
“1. Please state the names of all persons known to you who have acquired any interest or who claim to have any interest in the lands which are the subject matter of the above styled cause, subsequent to 19 October 1955.”
Certain other related questions were asked not necessary to be detailed here.
The answers to the above interrogatories were filed on October 8, 1957, which answers were made by the attorney for the Bellamys. The answer to the interrogatories stated that they were being answered by the attorney as the Bellamys had no record or memory of the transactions as the sales wore handled through the office of the Florida-Carolina Land Corporation. The answer further stated:
" * * * It may be that there have been other transactions of record by the parties who received deeds, but I have no knowledge of any such transactions. I assume they would be of record in Citrus County, if there be any such transactions subsequent to receiving deed or contracts from the plaintiffs.”
Attached to the answer to the interrogatories was a schedule showing the legal description of the land, the type of contract or conveyance, and the date interest was acquired.
It is noted that these dates range from March 7, 1956 to May 8, 1956.
It will be observed that the interrogatories requested a list of parties to whom conveyances were made subsequent to October 19, 1955.
*222 It will be observed from the pleadings, affidavits, and the evidence in the original trial, which was before the lower court on the motion for summary judgment, that the counter-claimants contended that the termination date of the authority of the Bellamys to sell to the Bakers and others was October 19, 19SS. The court, however, in its decree determined that the date was December 8, 1955, the date of the filing of the counterclaim.
We are of the opinion that the lower court, based on the data before him, on the motion by the counter-plaintiffs for a summary decree, erred in determining as a matter of fact that no sales were made by the Bellamys prior to December 8, 1955. The function of the trial court in passing on a motion for summary judgment is to determine whether there is a genuine issue of any material fact but the court cannot determine or resolve an issue of fact in passing on the motion. Warring v. Winn-Dixie Stores, Inc., Fla.App.1958, 105 So.2d 915. If there is any doubt as to the existence or non-existence of a material fact, then such doubt must be resolved against the movant. Manning v. Clark, Fla.1954, 71 So.2d 508. Although in the instant case no affidavits were filed in opposition to the motion for summary judgment, the above testimony and answers to interrogatories created a sufficient dispute of fact as to .render the entry of a summary judgment improper. See Flaherty v. Metal Products Corporation, Fla.1955, 83 So.2d 9. We are of the opinion that there is a genuine issue of fact to be determined in the case and we therefore reverse the able trial judge for a trial before him of whether or not bona fide sales were made by the Bellamys of any of the lands involved in this suit prior to December 8, 1955.
The summary judgment is affirmed in all other respects. Affirmed in part and reversed in part.
KANNER and SHANNON, JJ., concur.